This matter came before me on the return of an order to show cause why a temporary restraint should not be continued pending final hearing.
The bill of complaint and affidavits annexed thereto allege that William McGovern is the sheriff of Hudson County and that he has, for many years, held high elective and appointive offices in Jersey City and Hudson County; that he has always borne a good reputation both as a public officer and a private citizen; that he is officially known to most of the law enforcement officials of this and other states; that he resides in Jersey City with his family and intends to continue to reside there and has no intention of leaving the jurisdiction; that *Page 26 
he has been indicted by the Hudson County grand jury, charged with having failed to cause certain persons to be fingerprinted and photographed after they pleaded to an indictment against them; and that he is about to be arrested and taken into custody for the purpose of arraignment and pleading to said indictment; that he intends to enter a plea of not guilty, being conscious of his innocence and confident that he will be acquitted of the offenses of which he stands accused.
The bill of complaint further alleged that complainant will be required, pursuant to the statutes of this state, to submit to the taking of his fingerprints and photograph, and that the same will then be forwarded to the superintendent of State Police; to the rogues' galleries in other states; to the office of the Federal Bureau of Investigation; to Scotland Yard, England, and to the police departments of other countries; that such fingerprinting and photographing, and the distribution of copies thereof in advance of conviction, as required by our statute, will, among other things, violate his right of privacy, which right is said to be protected by the provisions of the constitution of this state and the constitution of the United States.
Complainant charges that he is without an adequate remedy at law and prays for an injunction against the attorney-general, who is also the acting prosecutor of the pleas of Hudson County, and against the superintendent of State Police, their agents, c., enjoining the taking of his fingerprints and photographs, and the forwarding of copies thereof, unless and until he be convicted.
The bill also asks for an ad interim restraint to the same effect. I advised an order to show cause with an ad interim
restraint.
The bill of complaint also alleges that the sheriff is not guilty of the offense for which he was indicted. This allegation is immaterial to the issue here presented. It is not the province of this court to pass upon the sufficiency of the indictment.
One of the affidavits filed on behalf of the defendant is that of the solicitor of Frank J. Bartletta, the complainant in the *Page 27 Bartletta Cases which are hereinafter referred to. This affidavit establishes nothing which is not already a matter of record in the said cases.
Another affidavit, made by the acting supervisor of the State Bureau of Identification, sets forth that "the Hudson County jail" has furnished the State Bureau with several thousand sets of criminal identification records consisting of fingerprints, photographs, c., since July 1st, 1930, and that among these are the fingerprints and photographs of persons not charged with crime and held merely as material witnesses; that certain local police departments in Hudson County have likewise transmitted many thousands of such records. The affidavit further sets forth that more than 640,000 criminal identification records appear in the files of the State Bureau and that they are secret and not exposed to public view, c. So much of this affidavit as relates to law enforcement agencies, over which the sheriff has no control, is not material to the issue. It is neither averred in the affidavit that the state files contain only the records of persons who have been convicted nor is it denied that the records which reach the State Bureau are distributed to law enforcement officers and agencies all over the globe.
Another affidavit filed on behalf of the defendant is made by an investigator on the staff of the acting prosecutor of Hudson County which sets forth his official duties, principally relating to violations of the statutes concerning gambling, and that when an arrest is made the person is then arraigned before a judge after which all future responsibilities are those of the sheriff. This affidavit is not responsive to the allegations of the bill of complaint and accompanying affidavit and serves no useful purpose in the determination of this matter.
Three other affidavits are filed by persons who were employed in the maritime service who were held in the county jail as material witnesses, and were there fingerprinted and photographed. Whether the sheriff may fingerprint such a witness is immaterial to the issue.
From the proofs before me the allegations of the bill of complaint and the supporting affidavit are uncontroverted by the answering affidavits as to the issues to be decided here. In other words, there is no dispute concerning the facts. *Page 28 
The defendants argue that this court has no jurisdiction to grant the relief sought for several reasons. First, it is urged that equity will not enjoin a threatened criminal prosecution andMoresh v. O'Regan, 122 N.J. Eq. 388, is cited in support of such contention. In the O'Regan Case this court issued an injunction restraining the prosecutor of Hudson County from proceeding with the prosecution of a criminal complaint. If the relief sought here should be granted it would not prevent the acting prosecutor of Hudson County from bringing the complainant to trial upon the indictment. The court, in the O'Regan Case, merely said "that the Court of Chancery, in the situation herein, was without jurisdiction to enjoin prosecution of the indictments."
The case before me is not to enjoin a criminal proceeding. There are certain circumstances under which this court may restrain prosecutions although that situation does not exist in the pending case. Ex parte Young, 209 U.S. 123. Another exception is suggested by Mr. Justice Donges in the O'ReganCase (at p. 395).
It is also argued that equity will not restrain a libel or slander, citing the cases of Mayer v. Journeymen Stonecutters'Association, 47 N.J. Eq. 519; A. Hollander Son, Inc., v. Jos.Hollander, Inc., 117 N.J. Eq. 578; John R. Thompson Co., Inc.,
v. Delicatessen, c., Union, 126 N.J. Eq. 119. The solicitor of the defendants might also have cited the case of Weiss v.Levine, 133 N.J. Eq. 441. The reasons assigned for the reluctance of equity to restrain a libel or slander are, that this court will not set itself up as a censor and thereby violate the constitutional guaranties of free press and of free speech, and, that the remedy at law for damages is usually adequate. The circulation of identification records of an accused is not necessarily a libel. He may be found guilty in which case he would not be libeled. However, if the premature dissemination of such data amounts to a libel, the rule would not prevent a court of equity from acting. See 32 C.J., Injunctions, § 432.
Dean Pound, in 29 Harvard Law Rev. 640, said:
"So long as denial of relief * * * rests on no stronger basis than authority our courts are sure to find a way out." *Page 29 
"A way out" has been indicated by the Supreme Court of Missouri in State, ex rel. Reed v. Harris (1941), 153 S.W. Rep.
2d 834. In that case the relators were the chief of police and superintendent of the bureau of criminal identification of Kansas City. They sought a writ of prohibition against the judge to prevent him from entertaining jurisdiction of a pending injunction suit filed by one Root, as plaintiff, against the relators, as defendants. The object of the suit was to enjoin the sending of police photographs and fingerprints of Root to various law enforcement agencies throughout the country. Root was charged with a violation of a municipal traffic ordinance. In that case the court took occasion to say:
"We are satisfied that an action at law for damages would not be an adequate remedy. The damage, if any, flowing from the display of an innocent person's photograph in rogues' galleries throughout the country, is or might be a continuing one, and not capable of any fair estimation or measurement by a money judgment. The remedy at law would be incomplete, less prompt and less efficient than resort to equitable relief, and hence, would not constitute a bar to the latter."
In the case of Itzkovitz v. Whitaker, 115 La. 479;39 So. Rep. 499; 1 L.R.A. (N.S.) 1147, and in the case ofSchulman v. Whitaker, 115 La. 628; 39 So. Rep. 737,
injunctions were granted against premature circulation of such data in advance of conviction.
I, therefore, conclude that this court has jurisdiction under the circumstances in this case. Such jurisdiction is consistent with the general principle that where the legal remedy by way of a suit for damages is inadequate the ends of justice require relief by prevention in the place of mere compensation. This is the same theory upon which equity supports injunctions to restrain trespasses. 4 Pom. Eq. Jur. (4th ed.), § 1357.
Even the junior Pomeroy, in his Equitable Remedies (2ded.), § 632, writing at a time (1919) when the existence of the right of privacy as an independent right had not yet gained general recognition, said: *Page 30 
"If there is such a thing as a right of privacy, an injunction is certainly a proper remedy for its protection."
To the same effect see 54 C.J., Right of Privacy, § 14;41 Am.Jur., Privacy, § 35; Brex v. Smith, 104 N, J. Eq. 386. The Court of Errors and Appeals in the case of Vanderbilt v.Mitchell, 72 N.J. Eq. 910 (at p. 924), said:
"* * * the jurisdiction of equity is constantly growing and expanding, and relief is now granted in cases where formerly the courts would not have thought for a moment of so doing. From time immemorial it has been the rule not to grant equitable relief where a party praying for it had an adequate remedy at law, but modern ideas of what are adequate remedies are changing and expanding, and it is gradually coming to be understood that a system of law which will not prevent the doing of a wrong, but only affords redress after the wrong is committed, is not a complete system, and is inadequate to the present needs of society."
It is also argued by the defendant that the right of privacy is not a property right and that, therefore, equity has no jurisdiction to grant relief by way of injunction. Odgers, Libel Slander (1st. Am. ed.) *17, *18, said:
"Every man has a right to be protected from defamation, as much as from assault or bodily harm. `His reputation is his property and if possible more valuable than other property;' * * * Every man has a right to his good name, a right which no one may violate. And such a right is a real right; all men are bound to forbear from all such imputations against him as would amount to injuries to his reputation."
The law in this state is well settled that equity will intervene to protect the right of privacy. See Vanderbilt v.Mitchell, supra; Edison v. Edison Polyform and ManufacturingCo., 73 N.J. Eq. 136; Brex v. Smith, supra.
This court, and most courts of other states, have judicially noticed from time to time that American municipal police departments have for years maintained records pertaining to persons charged with having violated criminal laws and that law enforcement agencies have developed a practice of exchanging such records by custom and by statute. See Bartletta v. McFeeley,107 N.J. Eq. 141. *Page 31 
The term "fingerprints" appears for the first time in this state in Pamph. L. 1921 ch. 102 § 7. This act created the present state police and appears in the Revised Statutes of 1937 as R.S. 53:1-21.
The first act of the legislature which authorized the taking of fingerprints and photographs of persons "charged with or convicted of any crime or offense" appears in Pamph. L. 1929ch. 156 § 2, now R.S. 2:199-3, and gives probation officers the right to do so.
In 1930 the legislature enacted Pamph. L. 1930 ch. 65, nowR.S. 53:1-12 to 53:1-20. This statute established a State Bureau of Identification as a part of the Department of State Police and requires the supervisor of that bureau to procure and file fingerprints "of all persons who have been or may hereafter be convicted of an indictable offense within the state and also of all well-known and habitual criminals wheresoever the same may be procured."
R.S. 53:1-15 provides that sheriffs, chiefs of police, c., "shall immediately upon the arrest of any person for an indictable offense or of any person believed to be wanted for an indictable offense or believed to be an habitual criminal" take the fingerprints and photographs of such person and forward copies thereof "without delay" to the State Bureau.
The supervisor of the State Bureau is required by R.S.53:1-17 to co-operate with, instruct and assist such sheriffs, chiefs of police, c., "in the establishment and operation of their local systems of criminal identification and in obtaining fingerprints and other means of identification of all persons arrested on a complaint of an indictable offense." The supervisor under R.S. 53:1-19 is under a duty to co-operate with the bureaus in other states and with the Federal Department of Justice and to "carry on an interstate, national and international system of identification * * *."
The statute refers to seven distinct classes of persons whose fingerprints and photographs are to be collected and disseminated on a world-wide scale; to wit, (1) persons convicted of an indictable offense; (2) well known criminals; (3) habitual criminals; (4) persons arrested for an indictable offense; (5) persons believed to be wanted for an indictable *Page 32 
offense; (6) persons believed to be habitual criminals; (7) persons confined in workhouses, jails, reformatories, penitentiaries and other penal institutions.
Under this statute a person who may be confined in jail on a charge of disorderly conduct would have his fingerprints and photographs taken and distributed to the four corners of the globe.
The right of privacy is the right of an individual to be free from unwarranted publicity, or, in other words, to be protected from any wrongful intrusion into his private life which would outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. 41 Am. Jur., Privacy, § 2;54 C.J., Privacy, § 1.
The basic concepts underlying the right of privacy have their origin in the law of ancient Greece and Rome. Although the Anglo-American courts have long recognized the existence of the right, they based their relief upon the theory that property or contract rights were involved. For example, in our state that right has been protected under the guise of protecting an admittedly technical right of property. See Vanderbilt v.Mitchell, 72 N.J. Eq. 910 (at p. 919).
The first clear-cut recognition of the existence of the right of privacy as an independent right is found in an article in 4Harvard Law Review 193. Prior to that, however, in Cooley onTorts (2d ed.) 29, it was said that every man enjoys the right "to be let alone."
The existence of the right of privacy was repudiated inRoberson v. Rochester Folding Box Co., 171 N.Y. 538;64 N.E. Rep. 442; 95 L.R.A. 478. The court in rendering that decision was divided. Judge Gray filed a minority opinion which has since been adopted as the law in all but one of the jurisdictions which have considered the question; that is, that there is a right of privacy and that it will be protected by the courts.
The preponderance of authority tends to the view that the right of privacy exists as an independent right and that it is not merely an incident to some other long recognized rights such as those of property or contract. See 41 Am. Jur., Privacy, § 5;Rinish v. Meier Frank Co., 166 Or. 482; 113 Pac. Rep.
2d 438; 138 A.L.R. 1. *Page 33 
The Court of Errors and Appeals of this state mentioned the existence of that right and the jurisdiction of this court to protect and preserve it in the case of Vanderbilt v. Mitchell,supra. The court rejected the majority decision in the RobersonCase and referred to it as "a case seldom cited but to be disapproved." See, also, Edison v. Edison Polyform andManufacturing Co., supra; Brex v. Smith, supra; Bednarik v.Bednarik, 18 N.J. Mis. R. 633; 16 Atl. Rep. 2d 80.
It is now well settled that the right of privacy having its origin in natural law, is immutable and absolute, and transcends the power of any authority to change or abolish it. SeePavesich v. New England Life Insurance Co., 122 Ga. 190;50 S.E. Rep. 68; 69 L.R.A. 101. It is one of the "natural and inalienable rights" recognized in article 1, section 1 of the constitution of this state. In the case of Melvin v. Reid,112 Cal.App. 285; 297 Pac. Rep. 91, the court, referring to an identical provision of the constitution of that state, said:
"We find * * * that the fundamental law of our state contains provisions which we believe permit us to recognize a right to pursue and obtain safety and happiness without improper infringement thereon by others. * * * The right to pursue and obtain happiness is guaranteed to all by the fundamental law of our state. This right, by its very nature, includes the right to live free from the unwarranted attack by others upon one's liberty, property and reputation. Any person living a life of rectitude has the right to happiness, which includes a freedom from unnecessary attacks upon his character, social standing or reputation."
I have, therefore, reached the conclusion that the right of privacy exists and that said right is protected by our state constitution for the reasons above mentioned. I deem it unnecessary to determine the question as to whether that right is protected by the federal constitution.
The use of fingerprints, photographs and other descriptions for criminal identification is said to have two main purposes: (1) the identification of the accused as the person who committed the crime for which he is being held; and, (2) the identification of the accused as the same person who has been *Page 34 
previously charged with, or convicted of, other offenses against the criminal law. 14 Am. Jur., Criminal Law, § 133.
The cases dealing with the subject of fingerprinting and photographing as used in criminal identification systems are comparatively few. In New Jersey there are three cases:Bartletta v. McFeeley, 107 N.J. Eq. 141; affirmed, 109 N.J. Eq. 241
(which I will hereafter refer to as the first BartlettaCase); Bartletta v. McFeeley, 113 N.J. Eq. 67 (which I will hereafter refer to as the second Bartletta Case), andFernicola v. Keenan, 136 N.J. Eq. 9.
It appears from the first Bartletta Case that the court's attention was called to only one case in which it was held that fingerprints of an accused before conviction was unlawful and that case was Hawkins v. Kuhne, 137 N.Y.S. 1090; affirmed,208 N.Y. 555. My examination of the reports discloses that in addition to the Hawkins Case, the question was considered in at least four other earlier cases in New York. See Owen v.Partridge, 40 Misc. Rep. 415; 82 N.Y.S. 248; Gow v. Bingham,57 Misc. Rep. 66; 107 N.Y.S. 1011; People v. Hevern, 127 MiscRep. 141; 215 N.Y.S. 412; Bingham v. Gaynor, 141 App. Div. 301;126 N.Y.S. 353.
In the case of Owen v. Partridge, supra, the plaintiff sought an injunction to restrain the police commissioner from publishing plaintiff's photographs, measurements, c. The injunction was refused on the ground that, under the law of New York, equity would not take jurisdiction. Plaintiff had been arrested in 1899 as a card sharper. He was photographed and afterward arraigned and discharged because the complaining witness did not appear. He requested the police to destroy the photograph and apparently received some assurances that it would be destroyed. He claimed that he believed the photograph was destroyed until, in 1903, he was sought by the police on a charge of having swindled a passenger, and his photograph was then published. After publication of the photograph an application for an injunction and for the surrender, removal and destruction of the police file was made. The court in that case said that it did not:
"* * * deem it necessary to examine further the by no means clear question of the right to take, for police purposes, the photograph of a person merely suspected of crime * * *." *Page 35 
In Gow v. Bingham, supra, the court refused to grant a peremptory writ of mandamus to compel the police to destroy the relator's photographs, fingerprints, c., on the ground that the plaintiff had mistaken his remedy. At the time there was no statute providing for the taking of fingerprints and the police attempted to justify their action by the provisions of the New York charter which made it the duty of the police to preserve the peace, prevent crime and detect and arrest offenders. The court disposed of this contention in the following language:
"* * * To subject a citizen, never before accused, to such indignities, is certainly unnecessary in order to `detect and arrest' him; for he must have been detected and arrested before he can be so dealt with. It is unnecessary to `prevent crime,' for the acts for which indictment has been found, if criminal, have already been committed. The `public peace' cannot readily be disturbed by a man in the custody of the law, and his arrest will be all sufficient to accomplish that end, without imposing upon him further attack upon the inviolability of his person."
The court also considered the question as to whether this practice could be justified under the provisions of the city charter which gave the police commissioner the right to make rules and regulations reasonably necessary to carry out the duties imposed on him by law, and said:
"But, if no power is conferred upon him by law in this regard, any rule which he may promulgate respecting the same is utterly void. The exercise of any such extreme police power as is here contended for is contrary to the spirit of Anglo-Saxon liberty. It is a principle of the common law which has been reinforced by statutory provisions * * *, that every person is presumed to be innocent until the contrary be proved beyond a reasonable doubt. That presumption survives the finding of an indictment, arrest, arraignment, and the impaneling of a petit jury for the trial of the issue. It continues during the introduction of evidence upon the trial, the summing up of counsel, the charge of the court, and until the jury by its verdict of `guilty' has said that the presumption is overcome, or, by its verdict of `not guilty,' that the presumption has become an established fact. * * *" *Page 36 
The case of Bingham v. Gaynor, supra, was a libel suit. While it does not seem to be exactly in point it has, nevertheless, been cited by text writers in support of the statement that photographs and fingerprints may not be taken before conviction. The defendant, Gaynor, a former mayor of New York, wrote a letter to the then mayor, part of which was alleged to be libelous, and in that letter he made the following statement which was quoted in the opinion of the court:
"* * * our Supreme Court here, * * * decided that the police officials have no authority to measure and photograph persons and put their pictures in the Rogues' Gallery, unless on conviction of crime and sentence to prison, as the statutes expressly provide. Laws 1896, c. 440; Laws 1889, c. 382, Sec. 40. The case is Gow v. Bingham, reported in 57 Miscellaneous Reports, at page 66."
The above interpretation by former Mayor Gaynor of the decision in Gow v. Bingham, supra, has been approved by text writers as the proper interpretation of that case.
In the case of People v. Hevern, supra (1926), the defendant was involved in an automobile accident, arrested and charged with "felonious assault." Bail was denied for the reason that defendant refused to submit to the taking of his fingerprints. Chapter 419, New York Laws 1926, contained a provision that a person charged with a felony could not be admitted to bail until his fingerprints were taken. In deciding the case, the court said:
"Article 1, section 6, of the Constitution of the State of New York provides:
"`No person shall * * * be compelled, in any criminal case to be a witness against himself; nor be deprived of life, liberty or property without due process of law.'
"The sentence first quoted is also a prohibition in precise words, in the Fourteenth Amendment of the United States Constitution, against the action of any state. Finger printing is an encroachment on liberty of person. It is justifiable, as is imprisonment, upon conviction for crime, in the exercise of the police powers of the state, for the purpose of facilitating future crime detection and punishment. What can be its justification when imposed before conviction? *Page 37 
"What constitutes `due process of law' is ordinarily for the determination of the legislature, but it may not act without limit. From the beginning of time it has been recognized that, notwithstanding the presumption of innocence and in order to make effective punishment for crime, it is not an improper invasion of personal liberty to arrest a defendant on a charge of crime and to keep him detained until trial. The purpose of the arrest is to insure the defendant's appearance and to prevent escape. Recent tendencies of our laws have been in the direction of lessening the rigor and hardship of imprisonment before conviction, and, wherever consistent with the orderly administration of justice, the summons has been substituted for the warrant. The present legislation is a step in the other direction, and adds burdens upon mere indictment for crime. This physical restraint is not imposed as an incident of punishment for crime after conviction, but while the presumption of innocence endures.
"It is urged in support of the law that the fingerprint is in use as a means of identification in various departments of government unrelated to criminal law enforcement, such as license and permit bureaus and immigration agencies; that there is a growing movement to introduce it among our children in the public schools and elsewhere for better vital statistics; in fine, that fingerprinting is losing in the public mind its association with criminal guilt. Time may be when this system of identification becomes so universal that it is no longer connected in thought with crime. The mores of the people constantly change. But the innocuity of a practice must be tested in the light of its prevailing, and not possible future, significance. To charge that one's fingerprint records have been taken would ordinarily convey an imputation of crime, and very probably support a complaint of libel per se. In my judgment, compulsory fingerprinting before conviction is an unlawful encroachment upon person, in violation of the state and federal constitutions."
This decision has not been overruled, or even criticised, in any later case in New York and remains the law of that state.
In the case of Hawkins v. Kuhne, supra, decided in the year 1912, the plaintiff sued for damages; first, for assault, *Page 38 
and, secondly, for false imprisonment. Plaintiff had left his employment as manager of a Porto Rican company and started for New York. The Governor of Porto Rico cabled the New York district attorney requesting the arrest and detention of the plaintiff charging him with embezzlement. Upon his arrival in New York, plaintiff was arrested and held. He was taken before the defendant, a captain of police, and his photograph and fingerprints taken against his protest. It was held that this constituted a perfect cause of action on the first count of the complaint; that is, an assault. The court called attention to the following admission in appellant's brief:
"We do not question that the taking of the plaintiff's picture before conviction was an illegal act," and then said:
"This is in accord with a thorough examination and discussion of the law in the recent case of People, ex rel. Gow v.Bingham, 57 Misc. Rep. 66; 107 N.Y. Supp. 1011."
In addition to the case of Schulman v. Whitaker, supra, there are three other cases in the State of Louisiana closely related thereto.
The first case of Itzkovitch v. Whitaker, supra, was decided in 1905, and it was there held on appeal that the court had jurisdiction to issue a preliminary injunction to prevent the plaintiff's picture from being sent to the rogues' gallery before conviction, which injunction was continued until final hearing.
The second case is Schulman v. Whitaker, supra, decided the same year and to the same effect.
The next case is that of Schulman v. Whitaker, 117 La. 704;42 So. Rep. 227; 7 L.R.A. (N.S.) 274. In that case plaintiff was a pawnbroker and was arrested for receiving stolen property. His photograph was taken by the police. He was later tried and discharged. The lower court granted an injunction against placing his photograph in the rogues' gallery and sending it to other states. This action of the court was affirmed on appeal.
The next case of Itzkovitch v. Whitaker, 117 La. 708;42 So. Rep. 228, was similar to the facts in the Schulman Case, last above cited, and the injunction was granted following the decision in that case. *Page 39 
It appears in the four Louisiana cases that the court enjoined the distribution of photographs to the rogues' gallery and other states prior to trial and conviction.
The case of Downs v. Swann, 111 Md. 53; 73 Atl. Rep. 653; 23L.R.A. (N.S.) 739, is also referred to in the firstBartletta Case. In the Downs Case, the plaintiff was arrested charged with having embezzled city funds. He obtained an injunction restraining the Baltimore police from fingerprinting and photographing him before trial. On application of the defendant the injunction was dissolved and in its opinion dissolving the injunction, the court said, referring to the bill of complaint:
"* * * it does not allege the existence of a custom to put the photographs of unconvicted persons in the rogues' gallery, or charge the defendants with a purpose to put Downs' picture there, but only with an intention to preserve it for the use of the department."
The appellate court affirmed the order dissolving the injunction and said:
"* * * the photographing and measuring in the manner and for the purposes mentioned, and the use of his photograph and the record of his measurement to the extent set forth in the answer by the police authorities of Baltimore city, would not constitute a violation of the personal liberty secured to him by the Constitution of the United States or of this state."
The court then went on to say:
"* * * but we must not be understood by so doing to countenance the placing in the rogues' gallery of the photograph of any person, not a habitual criminal, who has been arrested, but not convicted, on a criminal charge, or the publication under those circumstances of his Bertillon record. Police officers have no right to needlessly or wantonly injure in any respect persons whom they are called upon in the course of their duty to arrest or detain, and for the infliction of any such injury they would be liable, to the injured person, in the same manner and to the same extent that private individuals would be."
The case of State, ex rel. Bruns v. Clausmeier,154 Ind. 599; 57 N.E. Rep. 541; 50 L.R.A. 73, is also cited in the *Page 40 
first Bartletta Case as authority for fingerprinting. This case contains obiter dictum to the effect that a sheriff has a right to adopt such measures as in his discretion "may appear to be necessary to the identification and recapture of persons in his custody if they escape." The decision, however, does not turn upon this point. In that case the relator sued the sheriff and his sureties on the sheriff's official bond seeking damages. Complainant charged that the sheriff had intended to ruin his reputation by publishing his photographs and causing them to be circulated to various police departments. The appellate court, in affirming the court below, said there was no liability of the sheriff on his official bond because he was not performing an official duty and it was, therefore, unnecessary to determine whether or not the photographs and the words thereon were libelous when considered in connection with the other allegations of the complaint.
Another decision cited in the first Bartletta Case is that ofShaffer v. United States, 24 App. D.C. 417. The question there was whether the accused's photographs could be used at the trial. Shaffer was charged with murder. The prosecutor offered in evidence his photograph, which had been taken for the purpose of identification at the time of his arrest. The objection to the admission of the photograph was that it violated the principle that a party cannot be required to testify against himself or to furnish evidence to be so used. The court held that in taking and using the photographic picture, there was no violation of any constitutional right. The court, however, went on to say that the taking of photographs for identification of criminals was the usual means employed and that it would be a matter of regret to have its use unduly restricted upon any fanciful theory of constitutional privilege. This last statement is strictly obiterdictum (as the question of taking the photographs was not involved).
A review of the foregoing cases reveals that, at the time of the decision of the first Bartletta Case, the courts of New York had condemned the taking of photographs and fingerprints in advance of conviction. Gow v. Bingham, supra; People v.Hevern, supra, and Owen v. Partridge, supra.
It is also apparent that the other cases cited as holding a *Page 41 
contrary view in the first Bartletta Case, go no further than to support the proposition that an accused may be photographed and fingerprinted in advance of conviction for the purpose of identification at the trial or to aid in his recapture if he becomes a fugitive from justice.
Defendants lay stress on the case of United States v. Kelly,55 Fed. Rep. 2d 67; 83 A.L.R. 122. In that case Kelly was arrested for violating the prohibition laws in that he sold a quart of gin to an enforcement agent. He was informed that his fingerprints must be taken. He objected. He was told that force would be used if he did not submit and he, therefore, allowed the prints to be made. Thereafter he moved for an order requiring the return of the fingerprints and for an injunction restraining the use of them on the ground that the taking of the fingerprints violated the Fifth Amendment to the federal constitution. The District Court Judge directed the return of the fingerprints on the ground there was no right to take the same under the common law or under any federal or New York State statute and stated that the return of them would obviate the necessity of issuing an injunction. See United States v. Kelly (E.D., N.Y., 1931),51 Fed. Rep. 2d 263. This order was reversed by the Circuit Court of Appeals. See 55 Fed. Rep. 2d 67.
The opinion of reversal in United States v. Kelly, supra, cites the case of Downs v. Swann, supra, which denies that the right is unqualified, and the case of State v. Clausmeier,supra, which, at best, justifies the practice to a limited extent. It also cites the case of O'Brien v. State,125 Ind. 38; 25 N.E. Rep. 137; 9 L.R.A. 323. This case is not in point as it merely holds that the forceful examination of the body of an accused to discover certain scars thereon was not a violation of the constitutional prohibition against self incrimination. It also cites the case of Mabry v. Kettering, 89 Ark. 551;117 S.W. Rep. 746. That case merely dissolved an injunction against the development and distribution of photographs on the ground that the officers disclaimed any intention to use them for any purpose other than the identification of the accused. It also cited the case of Shaffer v. United States, supra, which has been discussed above, and the first *Page 42 Bartletta Case. The opinion also cited the case of People v.Sallow, 100 Misc. Rep. 447; 165 N.Y.S. 915. There the defendant was convicted of disorderly conduct. Defendant appealed on the ground that it was error to require that her fingerprints be taken and placed in evidence after she had been convicted. It appears that the magistrate, before sentencing her, directed that she be fingerprinted in order that he might determine her sentence as the statute provided longer terms in cases of frequent offenders. The comparison of her fingerprints so taken established the fact that she had been convicted of similar violations on four previous occasions. On appeal, the court held that under the circumstances the taking of the defendant's fingerprints and their introduction into evidence was not a violation of the constitutional prohibition of self incrimination. The other case cited is United States v. Cross,9 Mackey (20 D.C.) 382. The summary of that case indicates that it dealt with the use of photographs of an accused as a method of establishing identity at the trial and held that this was not a violation of the constitutional prohibition against self incrimination.
A very significant statement is made in the opinion of the Circuit Court of Appeals in the case of United States v.Kelly, supra, which apparently had a bearing on the result reached by the court. At p. 70 the court said:
"It should be added that all United States attorneys and marshals are instructed by the Attorney-General not to make public photographs, Bertillon measurements, or fingerprints prior to trial except when the prisoner becomes a fugitive from justice, and are required to destroy or to surrender to the defendant all such records after acquittal or when the prisoner is finally discharged without conviction. There is therefore as careful provision as may be made to prevent the misuse of the records and there is no proof of any threatened improper use in the present case."
Defendants refer to the case of Shannon v. State (1944),182 S.W. Rep. 2d 384, decided by the Arkansas Supreme Court. In that case the defendant was accused of murder, arrested and released on bail. The prosecutor petitioned the court for leave to take defendant's fingerprints for identification *Page 43 
purposes stating that the sheriff had, through an oversight, failed to take the same. Defendant argued "that such an order would be an invasion of his constitutional rights not to be forced to give evidence against himself." This was another of the self incrimination cases and the court held that the taking of the fingerprints for identification purposes was proper, citing22 C.J.S., Criminal Law 937 § 616.
In the first Bartletta Case the court said:
"Whether any certain prisoner is to be fingerprinted and photographed is an administrative question to be determined by the head of the police department making the arrest, or by those subordinates to whom he may delegate the decision."
Mr. Justice Parker, in his concurring opinion on the appeal of the first Bartletta Case, 109 N.J. Eq. 241, said:
"I agree that at that time and under those circumstances the photographing and fingerprinting were legally justified as a means of identification in case of need; and, that, on the case as presented by the bill, was all that the Vice-Chancellor was required to decide. I am not ready to agree that it was lawful to retain them under any and all conditions, and that issue was not presented by the bill."
In the second Bartletta Case complainant had not been indicted and asked for the return of the fingerprints and photographs which were held by the officers and also those which had been sent out of the state. The local police who filed an answer denying complainant's right to relief, nevertheless voluntarily brought into court and surrendered the photographs, fingerprints and measurements of the complainant which were in the police department of Hoboken. The court held that the question of the fingerprints in the hands of the police department of Hoboken was, therefore, moot, and also held that the defendants had no control over the other officers to whom the photographs had been sent and, therefore, this court would not "attempt to compel defendants to exercise an authority which they do not possess." The second Bartletta Case, therefore, is not even authority for the taking of photographs and fingerprints.
In the case of Fernicola v. Keenan, supra, this court for the first time was asked to decide the question of whether or not *Page 44 
the arresting authority can be compelled to surrender fingerprints and identification records held by them. In that case the court said:
"* * * for the benefit of society * * * the police are justified in retaining such records, in certain cases. * * *"
The court, however, made this statement:
"* * * when a man of good repute has a false charge made against him and is cleared of it, it seems to me that the police should destroy his fingerprints and photograph, or remove them from the rogues' gallery."
The court then went on to say that in the absence of a statute, discretion in the matter belongs to the police. While I do not agree with all of the reasons which led to the result reached in the opinion, it does lay down the rule that a person who has been accused of a crime, either justly or not, cannot have the aid of this court or any court to remove the stigma of an unproved criminal charge in the absence of a statutory remedy. I believe that the procedure followed in the federal system, where there is no statute covering the matter, expressed in the case of UnitedStates v. Kelly, supra, is more in keeping with our concept of the rights of free citizens under our form of government in which the individual is not deemed to exist merely at the sufferance of the state.
I have reached the conclusion, that, by the better weight of authority, there is no justification for the taking of fingerprints, photographs and other measurements in advance of conviction except where the sole purpose to be served is to identify the accused as the person charged with the offense for which he is taken into custody, or for the purpose of using them to facilitate the recapture of an accused who becomes a fugitive. The opinion of Mr. Justice Parker in the appeal of the firstBartletta Case holds to this view.
R.S. 53:1-15 requires the arresting authority to take fingerprints but says nothing about taking photographs. This section, however, requires that photographs also be forwarded.
The Court of Errors and Appeals, in the first Bartletta Case,109 N.J. Eq. 241, held that this practice was justifiable "as a means of identification in case of need." For that purpose, *Page 45 
therefore, the statute may be said to be a reasonable exercise of the reserved police power of the state.
R.S. 53:1-19 requires the supervisor of the State Bureau of Identification to "carry on an interstate, national and international system of identification." It also requires the arresting authority to forward copies of the fingerprints, c., to the superintendent of State Police. Therefore, those records are disseminated throughout the entire world. There is no provision in the statute for the protection of the right of privacy which is enjoyed by those who may be the victims of unfounded, unjust, false or malicious accusations. Is such a statutory mandate a proper and reasonable exercise of the reserved police power of the state? I think not.
The collection and dissemination of fingerprint records seem to be almost an obsession among modern American law enforcement agencies. In our state fingerprint files are maintained by local police, sheriffs, prosecutors, state police, and all institutions of detention. It sometimes happens that men who are completely innocent are indicted by partisan grand juries for the sole purpose of serving the personal, private or political advantage of some hostile group which controls a grand jury. See State v.Borg, 9 N.J. Mis. R. 59; 152 Atl. Rep. 788. Under our statute, a person so persecuted would be fingerprinted and photographed and these records would be given widespread circulation. Upon his vindication, the injury to his reputation, by the circulation of such information, could not be undone. Second Bartletta Case;Fernicola v. Keenan, supra.
As pointed out in People v. Hevern, supra, a charge that one's fingerprints have been taken would ordinarily "convey an imputation of crime" and it is there suggested that such a charge would probably be libelous per se.
It cannot be seriously denied that a person is defamed by the taking and widespread dissemination of his fingerprints and photographs for criminal identification purposes before conviction. After a person has been convicted and had the benefit of the constitutional protections of "due process," the injury is negligible. If the person is innocent the injury may be of great consequence. *Page 46 
It seems to me that an unnecessary and premature dissemination of such records is inconsistent with the fundamental principles of our criminal law. Even where a person is guilty, he has, under our system, the benefit of a presumption of innocence until that presumption is overcome by proof establishing his guilt beyond a reasonable doubt. See State v. Burke, 81 N.J. Law 93; State
v. Serlinsky, 115 N.J. Law 560; State v. Borg, supra.
I am of the opinion that unless an accused becomes a fugitive from justice there exists no right to publish or disseminate his fingerprints, photographs, c., in advance of conviction and that any attempt to do so constitutes an unnecessary and unwarranted attack upon his character and reputation, and violates his natural right of privacy, since it serves no useful or necessary public need. See Itzkovitch v. Whitaker,115 La. 479; 39 So. Rep. 499; 1 L.R.A. (N.S.) 1147; Schulman v.Whitaker, 115 La. 628; 39 So. Rep. 737, and Downs v. Swann,supra. It is apparent that the ruling of the Department of Justice, to which reference is made in United States v. Kelly,supra, may fairly be assumed to be predicated upon the same consideration.
I have, therefore, reached the conclusion that so much of R.S.53:1-15 and R.S. 53:1-19 as requires the premature dissemination of such records is an unreasonable, unnecessary and improper attempt to exercise the reserved police power of the state, and contravenes article 1, paragraph 1 of our state constitution.
The case of Hodgeman v. Olsen, 86 Wn. 615;150 Pac. Rep. 1122; L.R.A. 1916 A. 739 is not in point. In that case the court refused to compel the return of photographs, c., of a person who had been convicted of grand larceny and served a portion of his sentence before being pardoned. The refusal was based upon the failure to allege or prove that the prison authorities intended to make further distribution of the records.
The defendants contend that the complainant, as an administrative officer charged with the duty of taking and forwarding fingerprints, c., under the statute, is estopped from asserting the unconstitutionality of that statute; that he is *Page 47 
estopped because he has caused and permitted fingerprints, c., of many accused persons to be taken and forwarded before conviction; that he is estopped because he was indicted for failure to take the fingerprints, c., of certain indicted persons and that his indictment led to the filing of this bill; and, that he is estopped because he and his predecessors in office have, for many years, voluntarily taken fingerprints, 
c., before the statute was enacted. The authorities cited, in support of the above contentions, are not apposite and I find no merit in the argument. What complainant may have done as sheriff is not pertinent to his right to protect his natural right of privacy as an individual. As I stated above, the question of whether or not complainant was under a duty to act may be a matter for determination in the criminal proceedings against the sheriff but this court is not here concerned with the sufficiency of the indictment, or the guilt or innocence of the sheriff. The mere fact that complainant and his predecessors in office voluntarily took photographs of accused persons and forwarded the same could not legalize a practice which was inherently wrong.
Defendants' brief alleges that the complainant, as sheriff, "* * * has fingerprinted every person who has been indicted and called upon to plead except those who were his friends or his political associates, * * *." The answering affidavits contain nothing which, even by inference, support such an accusation. I cannot give this contention any serious consideration.
I will, therefore, advise an order lifting the restraint against the taking of complainant's fingerprints and photographs or other criminal identification data but continuing the restraint against forwarding, disseminating or publishing the same in advance of conviction unless the complainant shall become a fugitive from justice. *Page 48